Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Justin Calabrese (JC 5436)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and
GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY.,
GEICO GENERAL INSURANCE  COMPANY and
GEICO CASUALTY COMPANY,

                                   Plaintiffs,

           -against-

LI-ELLE SERVICE, INC. and
JOHN DOES "1" – "5" (Identities not presently
known but intended to be the owners
of Li-Elle Service, Inc.),

                              Defendants.

------------------------------------------------------------------X

**AMENDED COMPLAINT**

Docket No.: 12-CV-2157
(KAM)(JO)

Plaintiffs Demand a Trial by
Jury

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively referred to

hereinafter as "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants,

hereby allege as follows:

## INTRODUCTION

1. This action seeks to recover more than Four Hundred Twelve Thousand ($412,000.00) Dollars that the Defendants wrongfully have stolen from GEICO by submitting, and causing to be submitted, fraudulent claims seeking payment for durable medical equipment and orthotic devices (e.g. cervical collars, lumbar-sacral supports, electronic muscle stimulator units, egg crate mattresses, etc.). These goods purportedly were provided to individuals ("Insureds") who were involved in automobile accidents and were eligible for insurance coverage under GEICO insurance policies.

2. In addition, GEICO seeks a declaration that it is not legally obligated to pay more than Three Hundred Fifty Five Thousand ($355,000.00) Dollars in fraudulent claims submitted through Li-Elle Service, Inc. ("Li-Elle") because:

   (i) Defendant Li-Elle made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the durable medical equipment and orthotic devices it allegedly provided to Insureds in order to induce GEICO to pay Li-Elle "No-Fault" reimbursement to which Li-Elle was not entitled;

   (ii) Defendant Li-Elle made false and fraudulent misrepresentations to GEICO by submitting charges for durable medical equipment and devices that never were dispensed to Insureds; and

   (iii) Defendant Li-Elle failed and/or refused to respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

3. The Defendants fall into the following categories:

   (i) Defendant Li-Elle is a New York corporation that purported to purchase durable medical equipment and orthotic devices from wholesale durable medical equipment and orthotic device dealers. Li-Elle then systematically submitted fraudulently inflated claims to GEICO and other New York automobile insurers for the durable medical equipment and orthotic devices.

2

(ii)     Defendant John Does "1" – "5" are persons who cannot presently be identified but are the owners of Li-Elle, (Li-Elle and John Does "1" – "5" are hereinafter collectively referred to as the "Li-Elle Defendants").

4.      As discussed below, the Defendants at all times have known that the claims for durable medical equipment ("DME") and orthotic devices submitted to GEICO were fraudulent because: (i) the charges intentionally were inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws; (ii) the claims misrepresented the nature and quality of the DME and orthotic devices that were actually provided; and (iii) in many cases, the goods and related services billed to GEICO never were actually provided to the Insureds in the first instance.

5.      As such, the Defendants do not now have – and never had – any right to be compensated for their claims for DME and orthotic devices. The chart attached hereto as Exhibit "1" sets forth a representative sample of more than 2,000 fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO. The Defendants' fraudulent scheme against GEICO began in June 2007, and has continued uninterrupted since that time as the Defendants continue to attempt collection on unpaid claims. As a result of the fraudulent scheme, GEICO has incurred damages of more than Four Hundred Twelve Thousand ($412,000.00) Dollars.

## THE PARTIES

### I.      Plaintiffs

6.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is

3

authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.   Defendants

7.   Defendant Li-Elle is a New York corporation with its principal place of business in Queens, New York, and purported to operate from 86-44 121st Street, Richmond Hill, New York. Li-Elle was incorporated on about March 26, 2007 and from as early as June 8, 2007 through October 30, 2008, intentionally submitted claims to GEICO that Defendants knew were fraudulent because (i) the charges grossly exceeded the maximum reimbursable amounts as per New York law and (ii) the charges represented durable medical equipment never dispensed and/or services never actually provided to GEICO insureds.   Although Li-Elle has ceased submitting fraudulent bills, Li-Elle continues to seek reimbursement on thousands of unpaid fraudulent claims.

8.   Defendants John Does "1" – "5" are citizens of New York who own and control Li-Elle. The identities of John Does "1" – "5" are presently unknown to GEICO but are the persons who submitted fraudulent claims through the use and operation of Li-Elle.

## JURISDICTION AND VENUE

9.   This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

10.   Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

4

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.    An Overview of the No-Fault Laws and Licensing Statutes**

11.    GEICO underwrites automobile insurance in the State of New York.

12.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

13.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

14.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

15.    The No-Fault Laws obligate individuals and healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish proof of their claims.

16.    The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 provides, in pertinent part, that "[u]pon request by the Company, the eligible injured person or

5

that person's assignee . . . shall ... (b) as may reasonably be required, submit to an examination under oath by any person named by the Company, and shall subscribe to same . . . , and (d) provide any other pertinent information that may assist the Company in determining the amount that is payable."

     17.     The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 also states that "[n]o action shall lie against the Company, unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage."

     18.     In addition, 11 N.Y.C.R.R. § 65-3.5 states, in pertinent part, that:

(i)     Subsequent to the receipt of one or more of the completed verification forms, any additional verification required by the insurer to establish proof of claim shall be requested within 15 business days of receipt of the prescribed verification forms. Any requests by an insurer for additional verification need not be made on any prescribed or particular form. . . ."

(ii)     "The insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested."

(iii)     "All examinations under oath . . . requested by the insurer shall be held at a place and time reasonably convenient to the applicant. . . . The insurer shall inform the applicant at the time the examination is scheduled that the applicant will be reimbursed for any loss of earnings and reasonable transportation expenses incurred in complying with the request. When an insurer requires an examination under oath of an applicant to establish proof of claim, such requirement must be based upon the application of objective standards so that there is specific objective justification supporting the use of such examination. . . ."

     19.     Because an examination under oath and provision of additional pertinent information necessary to verify a claim are conditions of coverage, an insurer may deny a healthcare provider's or individual's claim for No-Fault Benefits if the healthcare provider or individual claimant refuses to appear for an examination under oath or refuses to provide pertinent information necessary to verify a claim.

20.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3s and

HCFA-1500 Forms submitted by healthcare providers to GEICO, and to all other insurers, must

be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or
> other person files an application for insurance or statement of claim containing
> any materially false information, or conceals for the purpose of misleading,
> information concerning any fact material thereto, commits a fraudulent insurance
> act, which is a crime.

## II.     Regulations Governing Maximum Reimbursement for Durable Medical Equipment and Orthotic Devices

21.     Durable medical equipment generally consists of items that can withstand

repeated use, and primarily consists of items used for medical purposes by individuals in their

homes, such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator

units ("EMS units"), hot/cold packs, infrared lamps, lumbar cushions, massagers, orthopedic car

seats, transcutaneous electrical nerve stimulators ("TENs units"), thermophores (electrical moist

heating pads), over-the-door cervical traction units, and whirlpool baths. Orthotic devices, a

subgroup of DME, are instruments that are applied to the human body to align, support, or

correct deformities, or to improve the movement of joints, spine, or limbs. These devices come

in direct contact with the outside of the body, and include such items as cervical collars (i.e.,

"whiplash" collars), ankle supports, wrist braces, and the like.

22.     The No-Fault Laws set forth maximum charges that may be submitted by

healthcare providers for DME and orthotic devices. One of the primary purposes in limiting the

maximum charges for DME and orthotic devices is to ensure that Insureds' $50,000.00 in

maximum No-Fault Benefits are not artificially depleted by inflated DME and orthotic device

charges. In a June 16, 2004 Opinion Letter, the New York State Insurance Department

recognized the harm inflicted on Insureds by inflated DME and orthotic device charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

(A copy of the June 16, 2004 Opinion Letter is attached as Exhibit "2.")

23.     Effective October 6, 2004, the maximum permissible charge for DME and orthotic devices is the fee payable for such DME and orthotic devices under the New York State Medicaid program at the time such DME and orthotic devices are provided. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct 6, 2004)).

24.     If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable shall be the lesser of the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent, or the usual and customary price charged to the general public. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct. 6, 2004)).

25.     Insurers such as GEICO are entitled to receive a proper proof of claim. See 11 N.Y.C.R.R. § 65-3.8(f). To be eligible for payment, a claim seeking reimbursement for DME and/or orthotic devices must include a description of the "full particulars of the nature and extent" of the items and services for which payment is sought. See 11 N.Y.C.R.R. § 65-1.1.

**III.    The Defendants' Fraudulent Scheme**

26.     Beginning in June 2007 and continuing through to the present day, the Defendants masterminded and implemented a scheme through which they stole more than Four Hundred Twelve Thousand ($412,000.00) Dollars from GEICO through the submission of fraudulent claims for DME and orthotic devices. To date, the Defendants have submitted more than Seven Hundred Forty Thousand ($740,000.00) Dollars in fraudulent charges to GEICO. Although

8

more than Four Hundred Twelve Thousand ($412,000.00) Dollars has been paid, there are more than Three Hundred Fifty Five Thousand ($355,000.00) Dollars in claims that have yet to be adjudicated.

27.    The fraudulent scheme perpetrated by the Defendants involved the actions of the defendants and the participation of physicians and/or chiropractors and various DME wholesale companies. In coordination with the various DME wholesale companies, the Defendants paid kickbacks to multi-disciplinary No-Fault clinics in the New York metropolitan area that purport to provide treatment to high volumes of Insureds. In exchange for the kickbacks, physicians and/or chiropractors associated with the Clinics prescribed large amounts of DME and orthotic devices that purportedly were supplied to Insureds by the Defendants. The prescriptions were never given to the Insureds, but as part of the scheme, they were routed directly to the Defendants by the Clinics to ensure that the Insureds did not fill the prescriptions with legitimate DME and orthotic device retailers.

28.    In exchange for the kickbacks, the Clinics also ensured that their associated physicians and/or chiropractors prescribe DME and orthotic devices that *were not* covered by the New York State Medicaid fee schedule, thus enabling the Defendants to seek reimbursement on the DME and orthotic devices based on their purported acquisition costs with respect to such goods.

29.    To the extent that the physicians and/or chiropractors associated with the Clinics prescribed DME and orthotic devices that *were* covered by the New York State Medicaid Fee Schedule, the Clinics intentionally wrote the prescriptions in a generic, non-descript manner thus enabling the Defendants to: (i) misrepresent the nature and quality of the items intended for the patient and (ii) misrepresent the nature and quality of the items that they actually dispensed so as to claim entitlement to a higher fee payable.

9

30.     In order to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants entered into secret agreements with the various DME wholesale companies, whereby – in exchange for a share in the profits of the fraud and the Defendants' efforts in negotiating kickback agreements with the Clinics – the various DME wholesale companies provided the Defendants with low-quality DME that cost a mere fraction of the Defendants' actual "acquisition cost." In fact, much of the DME was actually manufactured in and imported from China, packaged and distributed by companies like "Frankies", "Yoramed" and "Painease".

31.     Nevertheless, the Defendants systematically represented that the inexpensive DME obtained from the various DME wholesale companies and ultimately dispensed to GEICO Insureds was high-quality, expensive products by submitting charges that were sometimes more than five times the true value of the products. Furthermore, the various DME wholesale companies provided the Defendants with fraudulently inflated wholesale invoices for the inexpensive DME that supported that Defendants' claims for reimbursement. These fraudulently inflated wholesale invoices: (i) stated wholesale prices for the DME and orthotic devices that were far in excess of the actual wholesale price of the DME and orthotic devices; and (ii) deliberately omitted any mention of the make and model of the DME and orthotic devices.

32.     To create the illusion that the Defendants actually paid the inflated prices on the wholesale invoices, the Defendants issued checks to the various DME wholesale companies for the full invoice amounts, and then submitted the checks to GEICO and other New York automobile insurers as proof of payment. The payment methodology has been nothing more than a façade as the various DME wholesale companies converted these checks to cash through the use of check cashers and other methods, then paid "rebates" to the Defendants - returning the majority of the amounts received to the Defendants, while retaining a portion for themselves.

10

33. The Defendants then created and submitted thousands of bills that – like the underlying wholesale invoices – deliberately omitted any meaningful information regarding the DME and orthotic devices, including the manufacturer, make and model of the DME and orthotic devices that the Defendants purportedly dispensed to Insureds.

34. The Defendants' creation and submission of such generic billing prevented GEICO and other insurers from identifying the manufacturer, make and model of the DME and orthotic devices and concealed the fact that: (i) the DME and orthotic devices dispensed by the Defendants, to the extent that they were provided at all, were inexpensive low-quality products that cost a mere fraction of what was represented; (ii) the Defendants, in virtually every instance, charged GEICO and other insurers far more than the maximum permissible amounts for the DME and orthotic devices that were supplied; and (iii) the Defendants frequently billed GEICO and other insurers for DME and orthotic devices they never supplied in the first instance.

35. To further conceal the scheme, the Defendants systematically failed to provide GEICO and/or refused to respond to repeated requests made by GEICO seeking information such as meaningful wholesale invoices containing descriptions of goods provided (i.e., make, model and manufacturer), proof of payment and additional information that would be necessary to determine whether the charges submitted by the Defendants were legitimate and the result of bona fide arms-length transactions between the Defendants and the various DME wholesale companies.

IV. The Specifics of LI-Elle's Scheme to Defraud GEICO

36. Beginning in 2007 the Defendants entered into kickback arrangements with several Clinics, and secret agreements with various DME wholesale companies who supplied fraudulent and inflated wholesale invoices to the Defendants in exchange for a share in the profits from the scheme.

11

37.     In exchange for payments from the Defendants, the Clinics – including facilities located at 63-17 Roosevelt Avenue, Woodside, New York, 88-11 Jamaica Avenue, Woodhaven, New York, 110-54 Springfield Boulevard, Queens Li-Elle, New York, 630 Flatbush Avenue, Brooklyn, New York, and 597-599 Southern Boulevard, Bronx, New York – directed their associated physicians and/or chiropractors to: (i) prescribe large amounts of virtually identical DME and orthotic devices to Insureds, without regard to the Insureds' symptoms; (ii) to primarily prescribe DME for which the New York State Medicaid program has not established a schedule of fees payable; and (iii) to issue generic prescriptions for DME and orthotic devices, omitting specific descriptions of the devices required so as to permit the Defendants to unilaterally pick and choose what DME or orthotic devices to dispense.

38.     Simultaneously, pursuant to their agreement with the Defendants, and in exchange for a share in the profits of the scheme and to support the efforts of the Defendants to negotiate kickback arrangements with the Clinics, the various wholesale companies, provided the Defendants with fraudulent wholesale invoices, which: (i) stated wholesale prices for the DME and orthotic devices far in excess of the actual legitimate wholesale price of the supplies; and (ii) deliberately omitted any mention of the manufacturer, make and model of the DME and orthotic devices.  The fraudulent wholesale invoices and prices were used by the Defendants as a basis for their calculations and representations that their claims for reimbursement were in accordance with the No-Fault laws when if fact, they were not.

39.     In cases where the New York State Medicaid program *has not* prescribed a fee payable for a given item or a class of items, the Defendants relied on the prices stated in the non-descript and fraudulently inflated invoices provided by the various wholesale companies to seek fees higher than what they were legally entitled by charging GEICO 150% of the inflated wholesale price.  For example:

(i)     The Defendants systematically submitted charges of $789.58 for "neuromuscular stimulators" representing that their purported "acquisition cost" was approximately $526.00 per unit. However, the legitimate wholesale cost for the stimulators supplied to the Defendants by the various DME wholesale companies never exceeded $75.00. In many instances, the items dispensed to Insureds were not actually neuromuscular stimulators units, but rather TENS units (for which $76.25 is the maximum scheduled reimbursable charge) or inexpensive Chinese imports that are available through internet vendors between $75.00 and $100.00. (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "3").

(ii)     The Defendants systematically submitted charges of $74.25 for accessory kits and often billed $82.50 for belts intended to be used with the stimulators above despite the fact that often times the accessory kits and belts were never actually prescribed – likely because the neuromuscular stimulators are usually accompanied by accessories and clips that are used to attach the units to waistlines. (Representative examples of the bills, prescriptions, delivery receipts and fraudulent invoices are also attached as Exhibit "3").

(iii)     The Defendants systematically submitted charges of $179.45 for "massagers" representing that their purported "acquisition cost" was approximately $120.00 per massager. However, the legitimate wholesale cost of massagers supplied to the Defendants by the various DME wholesale companies never exceeded $20.00. In fact, the massagers supplied by the various DME wholesale companies to the Defendants and ultimately dispensed to GEICO Insureds are available to the public for approximately $40.00.[1] (Representative examples of the

---

[1]     Morris Mizrahi, the principal of a DME distributor named United Yoram Distributors, was deposed as part of a Federal RICO action commenced by State Farm Insurance Company at which time he testified that he manufactures inexpensive "Yoramed" and "Painease" devices in China, imports them into the United States and sells them to DME retailers like Li-Elle at bottom

13

bills, prescriptions and delivery receipts and fraudulent invoices are also attached as Exhibit "3").

(iv)     The Defendants systematically submitted charges of $157.45 for "infrared heat lamps" representing that their purported "acquisition cost" was approximately $105.00 per lamp. However, the legitimate wholesale cost of the heat lamps supplied to the Defendants by the various DME wholesale companies never exceeded $20.00. In fact, the heat lamps supplied by the various DME wholesale companies to the Defendants and ultimately dispensed to GEICO Insureds are almost identical to the massagers above (with an added heating element) and are also available to the public for approximately $40.00. (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "3").

(v)     The Defendants systematically submitted charges of $565.00 for "whirlpools" representing that their purported "acquisition cost" was approximately $376.00 per whirlpool. However, the legitimate wholesale cost of whirlpools supplied to the Defendants by the various DME wholesale companies never exceeded $40.00. In fact, the "whirlpool spas" supplied by the various DME wholesale companies to the Defendants and ultimately dispensed to GEICO Insureds were inexpensive, portable over-the-tub air-blowers that were manufactured in China and are available to the public for approximately $60.00. (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "4").

(vi)     The Defendants systematically submitted charges of $621.00 for Cold Water Circulating Units (with pumps) representing that their purported "acquisition cost" was approximately $414.00 per unit. However, the legitimate wholesale cost of the cold water units

---

prices. For example, "Painease" massagers and heat lamps are currently sold by United Yoram Distributors to DME retailers like Li-Elle for no more than $14.00. Nevertheless, Li-Elle represents its wholesale cost for the same massagers and heat lamps to be approximately $120.00 and $105.00, respectively.

14

supplied to the Defendants by the various DME wholesale companies never exceeded $50.00. In fact, the units supplied by the various DME wholesale companies to the Defendants and ultimately dispensed to GEICO Insureds were inexpensive water thermoses with hoses and application pads. In fact, legitimate water circulating units are available to the public at an approximate retail price of $200.00, plus the cost of the pad. (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "5").

40.    In cases where the New York State Medicaid program *has* prescribed a fee payable for a given item or a class of items, the Defendants relied on the vague and generic prescriptions issued by the Clinics to misrepresent the nature of the items actually prescribed and furthermore misrepresented the item that the Defendants purportedly dispensed so as to claim entitlement to a higher fee payable. For instance:

(i)    The Defendants systematically submitted charges of $154.22 and using HCPCS Code E0184 and charges of $19.44 using HCPCS Code E0199 pursuant to prescriptions calling for "bed boards" and "egg crate" mattresses. Although the Defendants properly billed for and dispensed the egg crate mattresses using HCPCS Code E0199, the product represented by HCPCS Code E0184 is not a bed board at all. In fact, the product represented by HCPCS Code E0184 is a thick foam *mattress* that has an established reimbursable fee of $153.13, not the bed board prescribed and dispensed which is available to the general public for less than $40.00. (Representative examples of the prescriptions, bills and delivery receipts are attached as Exhibit "6").

(ii)    The Defendants systematically submitted charges of $298.43 using HCPCS Code E2611 pursuant to prescriptions calling for "lumbar cushions" or "back cushions" and charges of $238.45 using HCPCS Code T5001 pursuant to prescriptions calling for "car seats". Because basic lumbar cushions and car seats are generally inexpensive items, the

15

Defendants falsely characterized the items as "orthopedic" cushions and "orthopedic positioning pillows" and submitted charges to State Farm using HCPCS Code E2611 and HCPCS Code T5001. The product represented by HCPCS Code E2611 is a wheelchair back cushion that includes mounting hardware and the product represented by HCPCS Code T5001 is a positioning seat for persons with special orthopedic needs -- both much more sophisticated and expensive than the basic lumbar cushions and car seats indicated on the prescriptions. The products prescribed are not included in the Fee Schedule, therefore the Defendants are entitled to no more than the lesser of their acquisition (plus 50 percent) or the price charged to the general public – approximately $40.00. (Representative examples of the prescriptions, bills and delivery receipts are also attached as Exhibit "6").

(iii)      The Defendants systematically submitted charges of $250.00 using HCPCS Code L0510 and charges of $225.31 using HCPCS Code L0633 pursuant to prescriptions calling for "LSOs" or "lumbarsacral supports". Not only was HCPCS Code L0510 discontinued in 2005, but its replacement codes represent various lumbar supports ("LSOs") that are either complex, *custom-fitted* LSOs with *rigid* frames or *custom-fabricated* LSOs that are made from scratch through molds which fit the exact measurements of each individual patient. Such LSOs are much more sophisticated than basic, flexible elastic LSOs, which can be inferred were prescribed by examining the generic prescriptions provided by the Clinics and which have an established fee payable of $65.92. (Representative examples of the prescriptions, bills and delivery receipts are also attached as Exhibit "6").

(iv)      The Defendants systematically submitted charges of $75.00 using HCPCS Code L0172 pursuant to prescriptions calling for "cervical collars". The product represented by HCPCS Code L0180 is a *two-piece*, *semi-rigid* collar that is more sophisticated and more expensive than the basic foam collars indicated on the prescriptions and which have an

16

established fee payable of $6.80. (Representative examples of the prescriptions, bills and delivery receipts are attached as Exhibit "7").

        (v)    The Defendants systematically submitted charges of $1,033.77 and $1,150.00 using HCPCS Code K0647 pursuant to prescriptions calling for "LSOs – Custom Fitted". Not only was HCPCS Code K0647 discontinued in 2006, but its replacement code (L0638) represents a complex, *custom-fabricated* LSO which is made from scratch through molds made to conform to the exact measurements of each individual patient and is far more expensive than the custom-fitted LSOs actually prescribed. (Representative examples of the prescriptions, bills and delivery receipts are attached as Exhibit "8").

        (vi)    The Defendants systematically submitted charges of $511.25 using HCPCS Code E0855 pursuant to prescriptions calling for "cervical traction". The product represented by HCPCS Code E0855 is a cervical traction unit that is much more expensive than the basic cervical traction units indicated on the prescriptions. In fact, there are only five cervical traction units that are approved for HCPCS Code E0855, none of which were actually dispensed by the Defendants. Instead, the units dispensed to Insureds were either units that have established fees of anywhere from $21.36 to $371.70, or units that are not included in the Fee Schedule therefore limiting the Defendants to the lesser of their acquisition (plus 50 percent), or the price charged to the general public. (Representative examples of the prescriptions, bills and delivery receipts are attached as Exhibit "9").

    41.    Furthermore, the Defendants intentionally created and submitted bills seeking reimbursement the custom-fitted and custom-fabricated orthotics that never were dispensed to GEICO Insureds. Not only did the Insureds fail to receive the devices, they never were actually measured or fitted for the devices in the first instance. That is because the "custom- fitted" and "custom fabricated" supports and/or orthotics were not custom at all – they were nothing more

that Velcro fastened, pre-fabricated "one size fits all" supports which are subject to reimbursement at the lowest scheduled charge under the Fee Schedule.

42. In addition, the Defendants intentionally created and submitted fraudulent bills seeking reimbursement for delivery charges for the equipment allegedly dispensed to GEICO insureds. Specifically, bills were generated and submitted indicating that the Defendants delivered the DME and orthotic devices to the Insureds' homes. In actuality, to the extent that the Defendants provided the goods at all, most of the DME and orthotic devices were given to the Insureds in large black garbage bags or boxes at the Clinics. The Insureds were required to sign "delivery receipts" as a condition precedent to receiving the DME and orthotic devices, notwithstanding the fact that the "delivery receipts" were false.

## V. Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

43. The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and orthotic devices to Insureds, and their actual submission of charges to GEICO.

44. To induce GEICO to promptly pay the charges for the DME and orthotic devices, the Defendants have gone to great lengths to systematically conceal their fraud. Specifically:

(i) The Defendants deliberately failed to submit wholesale invoices with their initial bill submissions, thereby concealing the amounts that they actually paid for the DME and orthotic devices, the manufacturer, make, model, size, and quality of the goods, and the actual value of the goods in the legitimate marketplace. At the same time, The Defendants obtained fraudulent wholesale invoices from one or more of DME wholesale companies, stating prices far in excess of those actually paid by the Defendants, which were produced to the extent necessary to support the fraudulent charges.

(ii) To the extent that the New York State Medicaid program established fees payable for a given class of DME and orthotic devices, the Defendants misrepresented in the billing submitted to GEICO that they supplied more expensive items from the middle or top end of the class, rather than the inexpensive, basic items that actually were supplied.

18

(iii)   The Defendants submitted false delivery receipts in support of their billing that purported to demonstrate that the Insureds acknowledged receipt of the DME and orthotic devices, and delivery to their respective homes. Not only did these delivery receipts falsely state that the Insureds took delivery of the goods at their homes – thereby concealing the fact that the goods were handed to Insureds at the Clinics – they also deliberately omitted any mention of the manufacturer, make, model, size, or quality of the goods.

(iv)   Li-Elle's fraudulent concealment also is manifest in their failure to disclose the existence of the kickback arrangements with the Clinics.

(v)   Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that Li-Elle submit additional information regarding the wholesale prices, descriptions of goods provided (i.e., make and model), proof of payment and documentation necessary to determine whether the charges submitted through Li-Elle were legitimate. Nevertheless, in an attempt to conceal their fraud, the Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted through Li-Elle, including but not limited to requests for examinations under oath.

45.   To induce GEICO to promptly pay the fraudulent charges, the Defendants, routinely file expensive and time-consuming litigation against GEICO and other insurers if the fraudulent charges are not promptly paid in full, despite the fact that the Defendants are aware that their billing and claims are fraudulent.

46.   GEICO is under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations, omissions, and acts of fraudulent concealment described above, were designed to and did cause GEICO to justifiably rely on them. As a proximate result, GEICO has incurred damages of more than Four Hundred Twelve Thousand ($412,000.00) Dollars based upon the fraudulent charges.

47.   Because of the material misrepresentations and other affirmative acts taken by the Defendants to conceal their fraud from GEICO, GEICO did not discover and should not reasonably have discovered that their damages were attributable to fraud until shortly before it filed this Complaint.

19

48.     GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claims denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

49.     In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Li-Elle; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through Li-Elle, yet failed to obtain compliance with the request for additional verification; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through Li-Elle, or else to request additional verification of those claims, has not expired.

## FIRST CAUSE OF ACTION AGAINST LI-ELLE
### (Declaratory Judgment Under 28 U.S.C. § 2201)

50.     GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 49 of this Complaint as if fully set forth at length herein.

51.     There is an actual case in controversy regarding more than Three Hundred Fifty Five Thousand ($355,000.00) Dollars in fraudulent billing for DME and orthotic devices that allegedly have been provided to GEICO's Insureds.

52.     GEICO contends that Li-Elle has no right to receive payment for any pending bills they have submitted because:

        (i)     Li-Elle made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the durable medical equipment and orthotic devices it allegedly provided to Insureds in order to induce GEICO into paying Li-Elle "No-Fault" reimbursement to which Li-Elle was not entitled; and

20

(ii)    Li-Elle made false and fraudulent misrepresentations to GEICO by submitting charges for durable medical equipment and devices that never were dispensed to Insureds; and

(iii)   Li-Elle failed and/or refused to respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

53.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)    Li-Elle has no right to receive payment on any pending bills submitted to GEICO because it knowingly made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the durable medical equipment and orthotic devices it allegedly provided to Insureds in order to induce GEICO into paying Li-Elle "No-Fault" reimbursement to which Li-Elle was not entitled; and

(ii)    Li-Elle has no right to receive payment on any pending bills submitted to GEICO because it knowingly made false and fraudulent misrepresentations to GEICO by submitting charges for durable medical equipment and devices that never were dispensed to Insureds; and

(iii)   Li-Elle failed and/or refused to respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

## SECOND CAUSE OF ACTION AGAINST LI-ELLE AND JOHN DOES "1" THROUGH "5"
### (Common Law Fraud)

54.    GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 53 of this Complaint as if fully set forth at length herein.

55.    Li-Elle and John Does "1" – "5" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for DME and orthotic devices.

56.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

21

(i)     In every claim for DME and orthotic devices for which the New York State Medicaid program has not established fees payable, the representation that Li-Elle's charges for DME and orthotic devices did not exceed the lesser of the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent, or the usual and customary price charged to the general public.

(ii)    In every claim for DME and orthotic devices for which the New York State Medicaid program has established fees payable, the representation that the goods represented in the billing actually were the goods supplied to Insureds.

(iii)   In every claim, concealment of the fact that the DME and orthotic devices actually provided to Insureds were inexpensive, low-quality goods, rather than the far more expensive goods for which billing was submitted.

(iv)    In every claim, concealment of the fact that Li-Elle was rebated a large percentage of the money that it represented to have paid to various DME wholesale companies.

(v)     In every claim, concealment of the fact that the DME and orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Li-Elle and John Doe "1" paid kickbacks to the Clinics to induce the Clinics to direct their associated physicians and chiropractors to: (a) prescribe large amounts of medically unnecessary DME and orthotic devices; (b) primarily prescribe DME not covered by the New York State Medicaid fee schedule; and (c) with respect to DME and orthotic devices covered by the New York State Medicaid Fee Schedule, write the prescriptions in a generic non-descript manner, all of which was designed to permit Li-Elle and John Doe "1" to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to GEICO and other New York automobile insurers.

57.     Li-Elle and John Does "1" – "5" made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws, or that were far in excess of the charges that otherwise would be compensable under the No-Fault Laws.

22

58.    GEICO justifiably relied on Li-Elle's and John Does "1" – "5"'s false and fraudulent representations, and as a proximate result has incurred damages of more than Four Hundred Twelve Thousand ($412,000.00) Dollars based upon the fraudulent charges.

59.    The extensive fraudulent conduct of Li-Elle and John Does "1" – "5" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

60.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION AGAINST LI-ELLE AND
### JOHN DOES "1" THROUGH "5"
#### (Unjust Enrichment)

61.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 60 above.

62.    As set forth above, Li-Elle and John Does "1" – "5" engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

63.    When GEICO paid the bills and charges submitted by or on behalf of Li-Elle for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Li-Elle and John Does "1" – "5".

64.    Li-Elle and John Does "1" – "5" have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

65.    Retention of GEICO's payments by Li-Elle and John Does "1" – "5" violates fundamental principles of justice, equity and good conscience.

66.     By reason of the above, the Li-Elle and John Does "1" – "5" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of Four Hundred Twelve Thousand ($412,000.00) Dollars.

## JURY DEMAND

67.     Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.     On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Li-Elle has no right to receive payment for any pending bills submitted to GEICO totaling no less than Three Hundred Fifty Five Thousand ($355,000.00);

B.     On the Second Cause of Action against Li-Elle and John Does "1" – "5", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of Four Hundred Twelve Thousand ($412,000.00) Dollars, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.     On the Third Cause of Action against Li-Elle and John Does "1" – "5", more than Four Hundred Twelve Thousand ($412,000.00) Dollars, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       June 21, 2012

24

RIVKIN RADLER LLP

By:_____
   Barry I. Levy (BL 2190)
   Michael A. Sirignano (MS 5263)
   Justin Calabrese (JC 5436)
926 RXR Plaza
Uniondale, New York 11556-0926
Telephone:    (516) 357-3000
Facsimile:    (516) 357-3333

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company GEICO General Insurance Company and GEICO Casualty Company*

2628017 v1

25