UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE      **REPORT AND RECOMMENDATION**
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY,       12cv2157 (KAM) (VMS)
and GEICO CASUALTY COMPANY,

Plaintiffs,


v.


LI-ELLE SERVICE, INC.,
JOHN DOES 1-5,

Defendants.
-------------------------------------------------------------X

**Scanlon, Vera M.**, **United States Magistrate Judge.**

On May 18, 2012, Government Employees Insurance Company, GEICO Indemnity

Company, GEICO General Insurance Company, and GEICO Casualty Company ("Plaintiffs" or

"GEICO") filed a complaint against Defendants Li-Elle Service, Inc. ("Li-Elle") and John Does

1-5 (individuals who own and control Li-Elle).  *See* DE [1].  On June 21, 2012, Plaintiffs filed an

Amended Complaint ("Am. Compl.") against Defendants, alleging that Defendants were

involved in schemes to submit fraudulent claims seeking payment for durable medical equipment

("DME") and orthotic devices purportedly provided to individuals eligible for insurance

coverage under GEICO insurance policies.  *See* Am. Compl. ¶ 1, DE [4].  In GEICO's amended

complaint, GEICO seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, and

raises claims of common law fraud and unjust enrichment.  *See* Am. Compl. ¶¶ 50-66.  GEICO

seeks a declaration that it is not legally obligated to pay fraudulent claims submitted by

Defendants.  GEICO also seeks to recover the money it paid out on allegedly fraudulent claims

because of Defendants' alleged fraudulent schemes.

None of the Defendants has filed an answer or otherwise moved in this action.  Plaintiffs filed a request for a certificate of default on August 6, 2012.  *See* DE [6].  The Clerk of Court entered default against Defendant Li-Elle that same day.  *See* DE [7].  Plaintiffs filed a motion for default judgment as to Defendant Li-Elle on August 8, 2012.  *See* DE [8].  In support of their motion, Plaintiffs submitted a memorandum, *see* DE [9], and a declaration of Justin Calabrese, an associate with the law firm of Rivkin Radler LLP, counsel for Plaintiffs ("Calabrese Decl."), *see* DE [10].  The declaration contains the following exhibits: the amended complaint (Ex. A), the ECF docket sheet (Ex. B), a chart of the accrued interest on the payments made by GEICO because of the alleged fraud (Ex. C), and a proposed order for default judgment (Ex. D).  Plaintiffs also submitted a declaration of Jennifer Fogarty, Director of No-Fault Claims for Plaintiffs ("Fogarty Decl."), *see* DE [11].  Her declaration includes the following exhibits: a Tax Identification Payment Run ("TIN run") (Ex. 1), setting forth the amount of payments that GEICO made based on claims submitted by Li-Elle; a "Claim Run," a spreadsheet of claims made by Defendant to GEICO (Ex. 2); and a "Litigation Run" (Ex. 3), identifying all active lawsuits in which Li-Elle seeks payment from GEICO for DME.

The Honorable Kiyo A. Matsumoto referred Plaintiffs' motion to the undersigned for a Report and Recommendation as to liability and damages.  *See* Aug. 29, 2012 ECF entry.

I.     BACKGROUND

Plaintiffs' complaint alleges that Defendants have engaged in a large-scale insurance fraud scheme, resulting in GEICO paying out money on fraudulent claims.  Am. Compl. ¶ 5.  Plaintiffs allege that Defendant Li-Elle and others made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the durable medical equipment and orthotic devices they allegedly provided to Insureds in order to induce GEICO to pay Li-Elle

"No-Fault" reimbursements to which Li-Elle was not entitled.  Am. Compl. ¶ 2(i).  GEICO

alleges that Defendants made fraudulent misrepresentations to GEICO by submitting charges for

durable medical equipment and devices that were never dispensed to Insureds, Am. Compl. ¶

2(ii), and that Defendants failed or refused to respond to GEICO's proper requests for additional

verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to

pay the fraudulent claims, Am. Compl. ¶ 2(iii).  In reliance on the fraudulent charges, GEICO

paid Defendant Li-Elle more than $412,000.00; however, GEICO now only seeks $262,213.04 in

actual damages. Am. Compl. ¶¶ 26-35.  Furthermore, Li-Elle has unpaid bills in excess of

$204,000 pending against GEICO.  *Id.*

Plaintiffs' complaint briefly describes Defendants' fraudulent scheme as follows: Under

the New York State Medicaid Program, from October 6, 2004 forward, the maximum

permissible charge for DME and orthotic devices is the fee payable for such DME and orthotic

devices at the time such DME and orthotic devices are provided.  *See* 11 N.Y.C.R.R. (Appendix

17-C, Part F (a) (effective Oct. 6, 2004)); Am. Compl. ¶ 23.  If the New York State Medicaid

program has not established a fee payable for the specific item, then the fee payable shall be the

lesser of the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any

rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs

or any sales tax) to the provider plus 50 percent, or the usual and customary price charged to the

general public.  *See* 11 N.Y.C.R.R. (Appendix 17-C, Part F(a) (effective Oct. 6, 2004)); Am.

Compl. ¶ 24.  Li-Elle's scheme manipulated or breached the New York State fee schedules.

Beginning in June 2007 and continuing through the date of the complaint, Defendants

submitted more than $740,000.00 in fraudulent charges to GEICO.  Am. Compl. ¶ 26.

Defendant Li-Elle continues to attempt to collect on allegedly improper claims.  Am. Compl. ¶ 5.

3

The scheme involved the actions of Defendants and the participation of physicians and/or chiropractors and various DME wholesale companies.  Am. Compl. ¶ 27.  In coordination with the various DME wholesale companies, Defendants paid kickbacks to multi-disciplinary No-Fault clinics in the New York metropolitan area that purported to provide treatment to high volumes of Insureds.  *Id.*  In exchange for the kickbacks, physicians and/or chiropractors associated with the clinics doing business with Defendants prescribed large quantities of DME and orthotic devices that purportedly were supplied to Insureds by Defendants.  *Id.*  The prescriptions were never given to the Insureds, but as part of the scheme, they were routed directly to Defendants by the clinics to ensure that the Insureds did not fill the prescriptions with legitimate DME and orthotic device retailers.  *Id.*

In exchange for the kickbacks, the clinics also ensured that their associated physicians and/or chiropractors prescribed DME and orthotic devices that were not covered by the New York State Medicaid fee schedule, thus enabling Defendants to seek reimbursement on the DME and orthotic devices based on their purported acquisition costs with respect to such goods, as described above.  Am. Compl. ¶ 28.  To the extent that the physicians and/or chiropractors associated with the clinics prescribed DME and orthotic devices that were covered by the New York State Medicaid Fee Schedule, the clinics intentionally wrote the prescriptions in a generic, non-descript manner, thus enabling Defendants to (i) misrepresent the nature and quality of the items intended for the patient and (ii) misrepresent the nature and quality of the items that they actually dispensed so as to claim entitlement based on a higher fee payable.  *Id.* ¶ 29.

Plaintiffs further allege that, in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, Defendants entered into secret agreements with the various DME wholesale companies, whereby, in exchange for a share in the profits of the fraud, the

various DME wholesale companies provided Defendants with low-quality DME that cost a fraction of Defendants' actual "acquisition costs." *Id.* ¶ 30. Defendants systematically represented that the inexpensive DME obtained from the various DME wholesale companies and ultimately dispensed to GEICO Insureds was of a high quality and expensive. Defendants submitted excessive charges; sometimes the charges were over five times the true value of the products. *Id.* ¶ 31.

In order to create the illusion that Defendants actually paid the inflated prices on the wholesale invoices, Defendants issued checks to the various DME wholesale companies for the full invoice amounts, then submitted the checks to GEICO and other New York automobile insurers as proof of payment. *Id.* ¶ 32. Defendants created and submitted thousands of bills that deliberately omitted any meaningful information regarding the DME and orthotic devices that Defendants purportedly dispensed to Insureds. *Id.* ¶ 33. Defendants' creation and submission of such generic billing prevented GEICO and other insurers from identifying the manufacturer, make and model of the DME and orthotic devices, and concealed the fact that: (i) the DME and orthotic devices dispensed by Defendants, to the extent that they were provided at all, were inexpensive, low-quality products that cost a fraction of what was represented; (ii) Defendants, in virtually every instance, charged GEICO far more than the maximum permissible amounts under the Medicaid fee schedule and the New York No-Fault law for the DME and orthotic devices supplied; and (iii) Defendants frequently billed GEICO and other insurers for DME and orthotic devices they never supplied in the first instance. *Id.* ¶ 34.

GEICO could not discover the fraudulent nature of the billing and prescriptions. Defendants systematically failed to provide GEICO with information such as meaningful wholesale invoices containing descriptions of goods provided (*i.e.*, make, model and

5

manufacturer), proof of payment, and additional information that would be necessary to determine whether the charges submitted were legitimate. *Id.* ¶ 35.  In support of their allegations, Plaintiffs' complaint lists DME and orthotic devices for which GEICO was routinely overcharged. *Id.* ¶¶ 36-42.

## II.    DEFAULT JUDGMENT

Plaintiffs move for default judgment against the defaulting Defendant, Li-Elle Service, Inc., pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 55(b)(2).[1]  A two-step process exists for obtaining a default judgment.  *See James v. Arango*, No. 05-cv-2593 (TCP) (AKT), 2011 WL 1594832, at *7 (E.D.N.Y. Mar. 28, 2011).  First, when a party has failed to plead or otherwise defend, the Clerk of the Court enters the party's default pursuant to F.R.C.P. 55(a).  Second, the moving party may make an application for entry of default judgment pursuant to F.R.C.P. 55(b).  In this case, the Clerk of the Court has entered default as to Defendant Li-Elle Service, Inc.  *See* DE [7].  Presently before the Court is Plaintiffs' motion for entry of a default judgment as to Defendant Li-Elle's liability and damages.

"A default judgment is ordinarily justified where a defendant fails to respond to the complaint."  *SEC v. Anticevic*, No. 05-cv-6991 (KMW), 2009 WL 4250508, at *2 (S.D.N.Y. Nov. 30, 2009) (citing *Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir. 1984)).  The court should consider whether the plaintiffs have shown that the defendants had notice about the action and an opportunity to defend against it.  We look to the service here to see if Li-Elle had notice of the suit.  F.R.C.P. 4(e) allows service to be made in accordance with the service rules of the state where the district is located or service is made.  New York Business Corporation Law § 306(b)(1) allows for service of process on the Secretary of State as agent of a domestic or

---

[1] Plaintiffs have not identified the John Doe Defendants by name and do not seek a judgment against them now.

authorized foreign corporation.  Here, Plaintiffs effectuated service upon Defendant Li-Elle on

the New York Secretary of State on May 22, 2012.  *See* DE [3].  Service upon Li-Elle was

therefore proper under the BCL.

      A default constitutes a concession of all well-pleaded factual allegations of liability in the

complaint.  *See Cement & Concrete Workers Dist. Council Welfare Fund v. Metrofoundation*

*Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012); *First Mercury Ins. Co. Inc. v. Schnabel*

*Roofing of Long Island, Inc.*, No. 10-cv-4398 (JS) (AKT), 2011 WL 883757, at *1 (E.D.N.Y.

Mar. 11, 2011).  Upon default, the court accepts the allegations in the complaint pertaining to

liability as true.  *See Cement & Concrete Workers*, 699 F.3d at 234.  In considering whether to

grant a default judgment, a court must be "guided by the same factors [that] apply to a motion to

set aside entry of a default."  *First Mercury*, 2011 WL 883757, at *1.  These factors include: (1)

whether the default was willful; (2) whether ignoring the default would prejudice the opposing

party; and (3) whether the defaulting party has presented a meritorious defense.  *See Action S.A.*

*v. Marc Rich & Co.*, 951 F.2d 504, 507 (2d Cir. 1991); *Traffic Sports USA v. Modelos*

*Restaurante, Inc.*, No. 11-cv-1454 (ADS) (AKT), 2012 WL 3637585, at *1 (E.D.N.Y. Aug. 1,

2012).

      First, Defendant Li-Elle has not responded in any way.  This failure supports a

conclusion that the default was willful.  Second, in light of the defaulting Defendant's failure to

respond and Plaintiffs' efforts to prosecute its case, ignoring the default would certainly

prejudice Plaintiffs.  Third, the defaulting Defendant has failed to present any defenses.

Therefore, the relevant factors indicate that a default judgment is proper in these circumstances.

      The issue remains, however, whether Plaintiffs' well-pleaded allegations in the

complaint, if accepted as true, establish liability for all of the claims that Plaintiffs raise against

Li-Elle.  *See James*, 2011 WL 1594832, at *3 (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L Realty Corp.*, 973 F. 2d 155, 158 (2d Cir. 1992)).  As noted above, Plaintiffs seek a declaratory judgment against Defendant Li-Elle, as well as monetary damages from Defendant Li-Elle based on claims of fraud and unjust enrichment.

We briefly describe New York's No-Fault laws to help show the legal basis for Plaintiffs' claims.  New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.  Am. Compl. ¶ 12.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. L. §§ 5101 *et seq.*) and the regulations promulgated thereto (11 N.Y.C.R.R. §§ 65 *et seq.*) (collectively referred to as the "No-Fault laws"), automobile insurers are required to provide personal injury protection benefits ("No-Fault benefits") to Insureds.  *See* 11 N.Y.C.R.R. § 65-1.1.  No-Fault benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services needed because of a vehicular accident.  *See* N.Y. Ins. L. §§ 5102.  An Insured can assign his or her right to No-Fault benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  *See* N.Y.C.R.R. § 65-3.11(b)(2)(i).  In the alternative, healthcare providers sometimes submit claims to insurers using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").  Am. Compl. ¶ 14.  The No-Fault laws obligate individuals and healthcare providers that seek payment of No-Fault benefits to provide insurers

with additional verification in order to establish proof of their claims.  The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 provides, in pertinent part, that "[u]pon request by the Company, the eligible injured person or that person's assignee . . . shall . . . (b) as may reasonably be required, submit to an examination under oath by any person named by the Company, and shall subscribe to same . . . , and (d) provide any other pertinent information that may assist the Company in determining the amount that is payable."  *Id.*, Am. Compl. ¶ 16. Pursuant to Section 403 of the New York State Insurance Law, the NF-3s and HCFA-1500 Forms submitted by healthcare providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance
> company or other person files an application for insurance or statement of
> claim containing any materially false information, or conceals for the
> purpose of misleading, information concerning any fact material thereto,
> commits a fraudulent insurance act, which is a crime . . .

N.Y. Ins. L. § 403.

Plaintiffs' claims in this action are primarily based on Li-Elle's false claims for DME. Durable medical equipment is generally items that can withstand repeated use, and it is primarily used for medical purposes by individuals in their homes.  Am. Compl. ¶ 21.  Examples of such equipment include bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared lamps, lumbar cushions, massagers, orthopedic car seats, and whirlpool baths.  Orthotic devices, a subgroup of DME, are instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs.  These devices come in direct contact with the outside of the body, and include such items as cervical collars (*i.e.*, "whiplash" collars), ankle supports, and wrist braces.  The No-Fault laws set forth maximum charges that may be submitted by healthcare providers for DME and orthotic devices.  *See id.* ¶ 22.  One of the primary purposes in limiting

the maximum charges for DME and orthotic devices is to ensure that Insureds' $50,000.00 in maximum No-Fault benefits are not artificially depleted by inflated DME and orthotic device charges.  Under the New York State Medicaid Program, from October 6, 2004 forward, the maximum permissible charge for DME and orthotic devices is the fee payable for such DME and orthotic devices at the time such DME and orthotic devices are provided.  *See* 11 N.Y.C.R.R. (Appendix 17-C, Part F(a) (effective Oct. 6, 2004)).  As noted above, if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable shall be the lesser of the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent, or the usual and customary price charged to the general public.  *See id.*  Insurers such as GEICO are entitled to receive a proper proof of claim.  *See id.* § 65-3.8(f).  To be eligible for payment, a claim seeking reimbursement for DME and/or orthotic devices must include a description of the "full particulars of the nature and extent" of the items and services for which payment is sought.  *See id.* § 65-1.1.

III.     COMMON LAW FRAUD CLAIMS

Plaintiffs allege common law fraud against Defendant Li-Elle for having intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of the submission of hundreds of fraudulent bills seeking payment for DME and orthotic devices.  Am. Compl. ¶¶ 54-55.  Plaintiffs claim that Defendant's false and fraudulent statements of material fact and acts of fraudulent concealment include:

1. The representation that, in every claim for DME and orthotic devices for which the New York State Medicaid Program has not established fees payable, Li-Elle's charges did not exceed the lesser of the acquisition cost to the provider plus 50 percent, or the usual and customary price charged to the general public.

2. Defendants' representation that, in every claim for DME and orthotic devices for which the New York State Medicaid program has established fees payable, the goods identified in the billing actually were the goods supplied to Insureds.

3. The representation that inexpensive, low-quality goods supplied to Insureds were high-quality, more expensive goods.

4. Concealment of the fact that Li-Elle was rebated a large percentage of the money that it represented to have paid to various DME wholesale companies.

5. Concealment of the protocol by which Li-Elle and John Doe "1" paid kickbacks to the clinics to direct their physicians and chiropractors to prescribe unnecessary DME, primarily prescribe DME not covered by the New York State Medicaid fee schedule, and to write prescriptions for DME covered by the New York State Medicaid Fee Schedule in a generic, non-descript manner, so as to allow Li-Elle and John Doe "1" to manipulate the claims submissions.

Am. Compl. ¶ 56.

A claim for common law fraud under New York law requires (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity (*i.e.*, scienter), (3) reasonable reliance on the part of the Plaintiff, and (4) damages caused by the misrepresentation or omission. *See Schaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997).

Plaintiffs' complaint lays out, in detail with respect to each scheme, the specific fraudulent acts committed by Defendants, including Li-Elle.  Am. Compl. ¶¶ 26-42.  Plaintiffs allege, with sufficient particularity, that Defendants overbilled for some devices, billed for devices that were never dispensed, submitted bills with material misrepresentations about the amount that the entity was entitled to be reimbursed for devices, and omitted any references to its rebate and kickback arrangements.  Am. Compl. ¶¶ 1-2, 4, 26-42.  These representations and omissions establish material misrepresentations.  *See State Farm Mutual Auto. Ins. Co. v. Cohan*, No. 09-cv-2990 (JS) (WDW), 2009 U.S. Dist. LEXIS 125653, at *13 (E.D.N.Y. Dec. 30, 2009) (collecting cases); *Liberty Mutual Ins. Co. v. The Best Bus Ride, Inc.*, No. 7-cv-985 (FB), 2009 WL 1605541, at *2 (E.D.N.Y. June 5, 2009).

Plaintiffs allege that Defendants not only knew that they were submitting fraudulent claims to GEICO, but that they did so intentionally in a scheme for profit.  Am. Compl. ¶¶ 1, 4, 26-42.  This gives rise to a strong inference of fraudulent intent and is sufficient to establish the scienter requirement.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (explaining that the "strong inference of fraud" may be established by alleging facts that constitute strong evidence of conscious misbehavior).

Plaintiffs sufficiently allege reasonable reliance by explaining GEICO's duties under the No-Fault laws,  Am. Compl. ¶¶ 46-49, and by claiming that GEICO paid out the claims in reliance on the fact that the bills appeared, on their face, to have been submitted in accordance with the law, *id*. ¶ 44.  For example, GEICO is under a statutory and contractual obligation to promptly and fairly process claims within 30 days.  *See* N.Y.C.R.R. § 65-3.8; Am. Compl. ¶ 46. Because of the material misrepresentations and other affirmative acts taken by Defendants to conceal their fraud from GEICO, GEICO did not discover that its damages were attributable to

12

fraud until shortly before it filed its complaint.  Am. Compl. ¶ 47.  GEICO maintains standard office practices and procedures that are designed to ensure that no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault laws.  *Id*. ¶ 48.  In accordance with the No-Fault laws and GEICO's standard office practices and procedures, GEICO either timely and appropriately denied the pending claims for No-Fault benefits submitted through Li-Elle or timely issued requests for additional verification with respect to all of the pending claims for No-Fault benefits submitted through Li-Elle, yet failed to obtain compliance with the request for additional verification.  *Id*. ¶ 49.

Plaintiffs have also sufficiently demonstrated that they were damaged by Defendant's misrepresentations by alleging that they have paid out over $412,000.00 for claims from Defendant, $262,213.04 of which represents damages.[2]  Furthermore, there are outstanding claims in the amount of $204,021.50 that are based upon the same type of allegedly fraudulent representations.

These particularities are sufficient to show that Defendant Li-Elle is liable for fraud.  *See AIU Ins. Co. v. Olmecs Med. Supply, Inc.*, No. 04-cv-2934 (ERK), 2005 WL 3710370, at *14 (E.D.N.Y. Feb. 22, 2005) (determining that plaintiffs had sufficiently pleaded fraud by alleging a scheme by wholesalers and retailers for inflated charges on medical devices under New York's No-Fault laws).  Therefore, I respectfully recommend that this Court enter a judgment that Defendant Li-Elle is liable to Plaintiffs for common law fraud.

---

[2] After the complaint was filed, additional information became available, leading to GEICO's determination that it suffered actual damages in the amount of $262,213.04.  *See* Calabrese Decl. ¶ 7.  Since the complaint was filed, Li-Elle's pending claims decreased from $355,000.00 to $204,021.50.  *See id.*

IV.    DECLARATORY JUDGMENT

Plaintiffs seek a declaratory judgment against Defendant Li-Elle, stating that Li-Elle has no right to receive payment for any pending bills it has submitted, due to fraudulent representations made to GEICO in these bills.  Am. Compl. ¶¶ 50-53.

According to the Declaratory Judgment Act, a court may exercise its discretion to issue a declaratory judgment, but only in cases where the party seeking the declaratory judgment can demonstrate the existence of an actual case or controversy.  *See* 28 U.S.C. § 2201(a); *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993).  Such a controversy must be "real and substantial . . . admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir. 1993) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)).  Declaratory relief is appropriate where the judgment will serve a useful purpose in clarifying and settling the legal relations at issue, or when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings.  *See E.R. Squibb & Sons, Inc. v. Lloyd's & Co.*, 241 F.3d 154, 175 (2d Cir. 2001).  Courts within this district have found these requirements met in actions by insurers seeking declaratory judgments regarding alleged obligations of the insurance company relating to allegedly fraudulent claims.  *See*, *e.g.*, *Cohan*, 2009 U.S. Dist. LEXIS 125653, at *11–*12; *State Farm v. Bronx Healthcare Medical, P.C.*, 08-cv-4912 (LDW), 2009 U.S. Dist. LEXIS 125785, at *1 (E.D.N.Y. Feb. 26, 2009) (defaulting defendants not entitled to seek or collect No-Fault benefits from plaintiff).

According to Plaintiffs' complaint, not only did Li-Elle submit fraudulent claims that GEICO has already paid out, but Li-Elle still has outstanding claims against GEICO in the

14

amount of $204,021.50 in unpaid claims.  *See* Fogarty Decl. ¶ 10.  Plaintiffs' complaint alleges,

with particularity, that the claims made by Li-Elle are fraudulent because they are part of

Defendants' ongoing scheme to submit claims for devices within New York's statutory no-fault

insurance scheme.  Plaintiffs explain that, in cases where the New York State Medicaid program

has not prescribed a fee payable for a given item or class of items, Defendants relied on the

prices stated in the non-descript and fraudulently inflated invoices provided by various wholesale

companies to seek fees higher than that to which they were legally entitled by charging GEICO

150% of the inflated wholesale price.  Am. Compl. ¶ 39.

   The complaint describes the inflated invoices with particularity.  For example, Plaintiffs

claim that Defendants systematically submitted charges of $789.58 for "neuromuscular

stimulators" representing that their purported "acquisition cost" was approximately $526.00 per

unit.  *Id.* ¶ 39.  However, the legitimate wholesale cost for the stimulators supplied to Defendants

by the various DME wholesale companies never exceeded $75.00.  In many instances, items

dispensed to Insureds were not actually neuromuscular stimulators, but rather Transcutaneous

Electrical Nerve Stimulators ("TENS") units (for which $76.25 is the maximum scheduled

reimbursable charge) or inexpensive imports that are available through internet vendors, costing

between $75.00 and $100.00.  Paragraph 39(ii) of the Amended Complaint describes a similar

scheme perpetuated with respect to stimulator belts and alleges that the belts were never actually

prescribed.  Defendants systematically submitted charges of $74.25 for accessory kits and often

billed $82.50 for belts intended to be used with the stimulators discussed above despite the fact

that the accessory kits and belts were never actually prescribed – likely because the

neuromuscular stimulators are usually accompanied by accessories and clips that are used to

attach the units to waistlines.  Paragraph 39(iii) describes another scheme perpetuated by

inflating the "acquisition cost" of "massagers."  Defendants recurrently submitted charges of

$179.45 for massagers representing that their purported acquisition cost was approximately

$120.00 per massager.  However, the legitimate wholesale cost of massagers supplied to

Defendants by the various DME wholesale companies never exceeded $20.00, and the massagers

are available to the public for $40.00.  Paragraph 39(iv) alleges a similar scheme involving

"infrared heat lamps."  Defendants repeatedly submitted charges of $157.45 for these items,

while the legitimate wholesale cost of the heat lamps supplied to Defendants by the DME

wholesale companies never exceeded $20.00.  The heat lamps are available to the public for

$40.00.  Paragraph 39(v) alleges yet another scheme involving the inflation of the acquisition

cost of "whirlpools."  It was Defendants' practice to submit charges of $565.00 for "whirlpools"

representing that their acquisition cost was about $376.00 per whirlpool.  The market wholesale

cost of the whirlpools never exceeded $40.00.  Paragraph 39(vi) alleges another similar scheme

involving "Cold Water Circulating Units."  Defendants systematically submitted charges of

$621.00 for these items, representing that their acquisition cost was approximately $414.00 per

unit, while their wholesale cost never exceeded $50.00.

        Plaintiffs next allege that, in cases where the New York State Medicaid program has

prescribed a fee payable for a given item or a class of items, that Defendants relied on the vague

and generic prescriptions issued by the clinics to misrepresent the nature of the items actually

prescribed and furthermore misrepresented the items that Defendants purportedly dispensed so as

to claim entitlement to a higher fee payable.  Am. Compl. ¶ 40.  For instance, paragraph 40(i) of

the Amended Complaint claims that Defendants systematically submitted charges of $154.22

using HCPCS Code E0184 and charges of $19.44 using HCPCS Code E0199 pursuant to

prescriptions calling for "bed boards" and "egg crate" mattresses, respectively.  Although

Defendants properly billed for and dispensed the egg crate mattresses using HCPCS Code E0199, the product represented by HCPCS Code E0184 is not a bed board at all.  In fact, the product represented by HCPCS Code E0184 is a thick foam mattress that has an established reimbursable fee of $153.13, not the bed board prescribed and dispensed which is available to the general public for less than $40.00.

Subparagraphs (ii) through (vi) of paragraph 40 of the amended complaint describe further charges made by Defendants in which the nature of the items supplied was misrepresented to Plaintiffs.   Subparagraph (ii) describes a scheme committed on the part of Li-Elle involving "lumbar cushions" or "back cushions."  Defendants regularly submitted charges of $298.43 and $238.45 for items available to the general public for $40 (such that Defendants were entitled to only the acquisition cost plus fifty percent).  Subparagraph (iii) describes a similar scheme involving "LSOs" or "lumbar sacral supports."  Defendants as a matter of usual practice submitted charges of $250.00 and $225.31 for these items, which have an established fee payable of $65.92.  Subparagraph (iv) describes yet another scheme involving "cervical collars."  Defendants systematically submitted charges of $75.00 for these items, which have an established fee payable of $6.80.  Subparagraph (v) describes a much-the-same scheme involving "LSOs – Custom Fitted."  Defendants repeatedly submitted charges of $1,033.77 and $1,150.00, using an HCPCS code that was discontinued in 2006.  The item's replacement code represents a complex, custom-fabricated LSO which is made from scratch and is far more expensive than the LSOs actually provided.  Subparagraph (vi) describes a similar scheme involving "cervical traction" units.  Defendants routinely submitted charges of $511.25 for these units, using HCPCS Code E0855.  Only five cervical traction units are approved for HCPCS Code E0855, none of which was actually dispensed by Defendants.  The units dispensed to Insureds were either units

17

that have established fees between $21.36 to $371.70, or units that are not included in the fee
schedule, therefore limiting Defendants to the lesser of their acquisition cost (plus 50 percent), or
the price charged to the general public.

Plaintiffs further allege that Defendants intentionally created and submitted bills seeking
reimbursement of custom-fitted and custom-fabricated orthotics that were never dispensed to
GEICO Insureds.  The items supplied were allegedly Velcro fastened, pre-fabricated "one size
fits all" devices which are subject to reimbursement at the lowest scheduled charge under the Fee
Schedule.  Am. Compl. ¶ 41.  Plaintiffs allege that Defendants intentionally created and
submitted fraudulent bills seeking reimbursement for delivery charges for the equipment
allegedly dispensed to GEICO Insureds.  Am. Compl. ¶ 42.  The Insureds were required to sign
"delivery receipts" as a condition precedent to receiving the DME and orthotic devices,
notwithstanding the fact that the "delivery receipts" were false.  *Id.*

In making these allegations, Plaintiffs have established that this is an actual controversy
where a declaratory judgment would afford specific relief.  As discussed above, Plaintiffs allege
that some claims were purposefully inflated, and some were based on devices that were not
actually supplied.  Am. Compl. ¶ 2.  The inflated claims and claims made for equipment not
actually supplied are both "fraudulent claims" under the statutory scheme.  Am. Compl. ¶ 20
(stating that the No-Fault laws provide that knowingly filing a claim containing materially false
information, or concealing facts for the purpose of misleading, is a crime); *see AIU Insurance
Co.*, 2005 WL 3710370, at *2-*4, *14 (denying motions to dismiss fraud claims brought by an
insurer in a scheme to exploit the reimbursement formulas for medical devices under New
York's No-Fault laws).  These actions violated New York's No Fault laws and were fraudulent.
GEICO has satisfactorily pled its claims of common law fraud.  It has submitted documentary

evidence to support its claims.  It thus has established its entitlement to a declaratory judgment.

Accordingly, GEICO should not be obligated to pay these claims.  Therefore, I respectfully

recommend that this Court enter a declaratory judgment that Plaintiffs are not obligated to pay

the fraudulent claims submitted by Defendant Li-Elle.

V.      UNJUST ENRICHMENT CLAIMS

Under New York law, recovery for unjust enrichment requires establishing that (1) the

Defendant benefited, (2) at the Plaintiff's expense, and (3) equity and good conscience require

restitution.  *See Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 519 (2d Cir. 2001); *State v.

Barclays Bank*, 76 N.Y.2d 533, 561 (1990).

Plaintiffs have adequately alleged that Defendant Li-Elle benefitted at Plaintiffs' expense

because Li-Elle received payouts on claims that were either inflated or fabricated, as described

above.  Am. Compl. ¶¶ 1, 4, 5, 26-42.  Essentially, as described above, Defendants set up an

elaborate scheme to siphon money out of a statutory scheme designed for the public good.

Certainly, equity and good conscience require restitution.  Therefore, I respectfully recommend

that this Court enter a judgment that Defendant Li-Elle is liable to Plaintiffs for unjust

enrichment.  I do note that the damages sought here are essentially the same as those available

under the common law fraud claims discussed above in Section III.

VI.     DAMAGES

Although the allegations of a complaint pertaining to liability are deemed admitted upon

entry of a default judgment, allegations related to damages are not.  *See Cement & Concrete

Workers*, 699 F.3d at 234; *First Mercury*, 2011 WL 883757, at *2.  A hearing on damages may

be held but is not mandatory.  *See Cement & Concrete Workers*, 699 F.3d at 234.  In this case,

the Court need not hold a hearing because it can determine damages based upon Plaintiffs'

extensive, detailed submissions, supported by sworn statements.

      In support of their motion for default judgment, Plaintiffs submitted a declaration of

Jennifer Fogarty, Director of No-Fault Claims for Plaintiffs and of Justin Calabrese, an associate

at Rivkin Radler LLP and counsel for GEICO.[3]   The Calabrese Declaration, at paragraph 7,

footnote 2, explains that the complaint alleged that GEICO suffered actual damages exceeding

$412,000.00 and that Li-Elle has pending claims exceeding $355,000.00.  However, after

additional information became available, GEICO determined that it suffered actual damages in

the amount of $262,213.04, and since filing the complaint, Li-Elle's pending claims decreased

from $355,000.00 to $204,021.50.  Exhibit 1 to the Fogarty Declaration is a tax identification

payment run (a "TIN Run") setting forth the amount of payments that GEICO made based on

claims submitted by Li-Elle.  When a payment to a healthcare provider is authorized by GEICO,

the designated information is inputted into GEICO's computer systems, which in turn generates a

check that is issued and catalogued according to the tax identification number of the payee.  *See*

Fogarty Decl. ¶ 5A.  The information in GEICO's earnings reporting system from which the TIN

Runs are generated is compiled and maintained in the ordinary course of GEICO's business.  *See*

*id.*  The TIN Run draws payment information from GEICO's earnings reporting system, from

which IRS Forms 1099-MISC are generated for payees and reports are prepared for the Internal

Revenue Service.  *See id*.  The TIN Run shows total payments from GEICO to Defendant in the

amount of $262,213.04 in connection with the fraudulent claims.  *See id.*  As Plaintiffs have

demonstrated that Defendant Li-Elle is liable to them for common law fraud and unjust

---

[3] The Court notes that the Declaration of Jennifer Fogarty begins, "Jeremy Connor, hereby declares the truth of the following pursuant to 28 U.S.C. § 1746."  The declaration is then signed by Jennifer Fogarty.  The Court understands this to be an error without significance.

enrichment, *see* Parts III and V, above, I respectfully recommend that this Court enter a judgment of $262,213.04 against Defendant Li-Elle and in favor of Plaintiffs.

The award of prejudgment interest is a substantive issue, governed by the state substantive law of the forum state in which the federal court sits, namely New York. *See Terwilliger v. Terwilliger*, 206 F.3d 240, 249 (2d Cir. 2000) (applying state law to the question of prejudgment interest in a diversity case). New York law provides for the award of prejudgment interest on damages, computed from the "earliest ascertainable date the cause of action existed" at the non-compoundable rate of nine percent per annum. N.Y.C.P.L.R. §§ 5001(a), 5004. A plaintiff is entitled to prejudgment interest when a defendant has been found liable for "an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property . . . ." *Id.* § 5001(a). "The award of prejudgment interest in cases of fraud, unjust enrichment and breach of fiduciary duty is proper where a defendant wrongly held a plaintiff's money." *De Beeck v. Costa*, No. 101984/06, 2013 WL 322244, at *12 (N.Y. Sup. Ct. Jan. 24, 2013). Here, Plaintiffs have demonstrated that Defendant Li-Elle has deprived Plaintiffs of funds that Plaintiffs would not have paid, except for Defendant's fraudulent acts.

Plaintiffs request interest on the sums paid to Defendant Li-Elle due to Li-Elle's fraudulent representations and unjust enrichment. In support of their request for prejudgment interest, Plaintiffs provide a detailed chart calculating the interest in accordance with the statutory requirements. *See* Calabrese Decl., Ex. C. In this chart, GEICO provides a statement of the distribution of the monies paid over a four-year period. *See id.* In assigning a "Time Multiplier," Plaintiffs calculate interest from January 1 of the year following the year in which payment was made by GEICO through August 31, 2012 (Plaintiffs' anticipated date of entry of default judgment). For example, for the year 2007, Plaintiffs assign a time multiplier of 5.75 to

the interest calculation.  The Court assesses interest of nine percent per year (as provided by statute) and multiplies that value by the number of years from January 1 of the year following the year in which the payments were made by GEICO until December 31, 2012, as shown in the chart below. [4]

| Billing Year | 2007 | 2008 | 2009 | 2010 | Total Interest on Payments until Dec. 31, 2012 |
|---|---|---|---|---|---|
| Paid to Li-Elle Service, Inc. | $25,243.10 | $232,682.83 | $3,564.56 | $722.55 | |
| Rate of interest per year | .09 | .09 | .09 | .09 | |
| | | | | | |
| Interest per Year | $2,271.87 | $20,941.45 | $320.81 | $65.02 | |
| Time in years | 6 | 5 | 4 | 3 | |
| | | | | | |
| Interest until Dec. 31, 2012 | $13,631.22 | $104,707.27 | $1,283.24 | $195.09 | $119,816.82 |

Between 2007 and 2010, GEICO paid Li-Elle $262,213.04 for fraudulent claims.  Nine percent annual interest on $262,213.04 yields $23,599.17 per year, or $64.65 per day.  There are 59 days from January 1, 2013 until and including February 28, 2013.  Therefore, based on an anticipated date of judgment of February 28, 2013, an additional $3,814.35 (59 x $64.65) should be added to the $119,816.82 calculated above, for total interest of $123,631.17.  Should the date of judgment be beyond February 28, 2013, the Clerk of Court should be directed to add

---

[4] The Calabrese Declaration ¶ 9 explains Ex. C and that calculating time from January 1 of the year following payment by GEICO is "less advantageous to GEICO, but easier for the Court to evaluate and calculate."  The Court understands that this method is less advantageous to GEICO because GEICO could assess interest starting at the "earliest ascertainable date the cause of action existed," or the date upon which GEICO paid each claim.  *See* N.Y.C.P.L.R. §§ 5001(a), 5004.  GEICO does not ask for compounded interest.

additional interest of $64.65 per additional day from February 28, 2013 through the date of judgment.

VII.    CONCLUSION

For the above reasons, I respectfully recommend that the District Court enter judgment against Defendant Li-Elle and in favor of Plaintiffs for the following: (1) a declaratory judgment that Plaintiffs are not obligated to pay the outstanding unpaid claims to Defendant Li-Elle in the amount of $204,021.50; (2) compensatory damages in the amount of $262,213.04; (3) interest in the amount of $123,631.17 (covering the period up to and including February 28, 2013) plus $64.65 per day for each day following February 28, 2013 until the date of judgment.

VIII.   OBJECTIONS

This Report and Recommendation will be filed electronically and a copy sent by mail to Defendant Li-Elle on this date, February 11, 2013, at its last known address in the record, 86-44 121st Street, Richmond Hill, NY 11418.  Any objections to this Report and Recommendation must be filed, with a courtesy copy sent to the Honorable Kiyo A. Matsumoto, by February 28, 2013.  Failure to file objections within the specified time waives the right to appeal.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).


Dated: February 11, 2013
          Brooklyn, New York


                                        _____/s/_____
                                        VERA M. SCANLON
                                 UNITED STATES MAGISTRATE JUDGE